[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action wherein the plaintiff, Tolland Bank, owner of a mobile home located in East Windsor in a mobile home park owner by the defendant, Wheel Estates, Inc., alleges, in four counts, that the defendant has refused to approve the resale of the mobile home to a prospective buyer in violation of the Connecticut Unfair Trade Practice Act (CUTPA), that such refusal constitutes fraud, that such refusal tortiously interfered with the plaintiff's contract with another, and violated state statutes. The plaintiff CT Page 4358 seeks monetary damages, injunctive relief, and attorney's fees and costs. The defendant denies the allegations and, by way of special defenses, asserts that the plaintiff has failed to exhaust administrative remedies and that the mobile home in question failed to meet reasonable resale requirements.
Sometime before November 1990, the plaintiff acquired ownership, by repossession, of the mobile home, manufactured in 1962, located on lot 19 of the Park Plaza Mobile Home Community, East Windsor, which mobile home park is owned by the defendant. On November 8, 1990, the defendant notified the plaintiff that it had learned that the mobile home had been placed on the market by the plaintiff (Defendant's Exhibit 1). This letter also indicated that, under the terms of the park rental agreement pertaining to this lot and mobile home, the mobile home must be inspected by and approved for resale by the defendant. Furthermore, the letter indicated that the defendant had chosen Blakely's Home Service to perform the inspection.
On November 21, 1990, the plaintiff acknowledged receipt of this letter and expressed dissatisfaction with the resale process (Defendant's Exhibit 2). On January 17, 1991, the plaintiff employed Berlin Mobile Home Service Center, Inc. to make certain plumbing repairs to the mobile home (Defendant's Exhibit 5).
On February 5, 1991, a prospective buyer, Suzette DeSousa, applied for financing to purchase the mobile home, which financing was approved but only if DeSousa's parents co-signed the loan (Plaintiff's Exhibit D). On February 12, 1991, DeSousa and the plaintiff signed a purchase agreement wherein DeSousa would purchase the mobile home for $20,000.00 (Plaintiff's Exhibit C).
On February 22, 1991, the plaintiff notified the defendant of this agreement and requested that the resale inspection be scheduled (Plaintiff's Exhibit A). On that same day the defendant notified DeSousa that she would have to apply for "entry approval" by the defendant before the defendant would lease the lot space to her (Defendant's Exhibit 9). This letter also indicated that entry approval was contingent upon receipt of a favorable credit report. CT Page 4359
On February 25, 1991, DeSousa submitted a rental application to the defendant (Defendant's Exhibit 20). This application contains a section which solicits information concerning loans to finance the purchase of the mobile home. This section requests the names of any co-signers for such a loan. DeSousa left the space provided for this purpose blank.
On April 26, 1991, the credit bureau utilized by the defendant forwarded its credit report regarding DeSousa to the defendant (Defendant's Exhibit 19). Based on the negative information contained in this report, the defendant disapproved DeSousa as a prospective tenant.
During February 1991, G. Barry Blakely of Blakely's Home Service inspected the mobile home in question. Blakely has many years of experience in the mobile home area including the purchase and sale of new and used mobile homes, the maintenance of mobile home parks, the repair of mobile homes, and the inspecting of mobile homes for resale. On February 28, 1991, Blakely submitted to the defendant his written report summarizing the results of his inspection of the unit in question (Defendant's Exhibit 6). The inspection of the unit included an exterior and interior examination. It was conducted in the presence of the defendant's general manager and corporate secretary, Dawn Borecki. Blakely would point out flaws to Borecki as he observed them.
Among other things, Blakely noted that the exterior panelling of the unit was buckling in places; that anchors or "tie-downs," required by the Connecticut Building Code through the incorporation of requirements of BOCA, designed to withstand high winds were absent; that heat tape needed to prevent water pipes from freezing were improperly and incompletely applied; that the subflooring had dropped in places exposing insulation and permitting access by vermin; that the wood deck adjoining the front door was rotted in places and in need of repair and repainting; that the rear steps were rickety and needed shoring and repainting; that the front door jalousie window was boarded over on the inside; that the windows had parts, including hand cranks, missing; that the roof coating was cracked and had lifted in spots necessitating the scraping and recoating of the roof; that the vinyl skirting of the unit was installed backwards in spots and needed venting to eliminate foul odors that CT Page 4360 emanated from underneath the unit.
As to the interior, Blakely noted that a refrigerator had been installed in front of a window so that persons outside the unit would observe the back of the refrigerator through the window; that the bathroom wall was sagging and separating from the ceiling; that the furnace was inoperable and needed cleaning; that the floor in the bedroom was so rotted in places that Blakely pushed his finger through to the outside, that wall studs in the bedroom had been damaged by water and become "punky" and that other evidence of water infiltration from the roof was evident; and that the plumbing appeared new but disconnected.
Blakely orally informed Borecki; that the unit was "junk" and should not be allowed to be resold but ought to be removed from the mobile home park. He opined that without extensive repair the unit was unlivable, unsafe, unsanitary, and aesthetically substandard.
Blakely testified that the was familiar with the resale approval standards of the defendant and other mobile home park owners throughout the state and that, when compared to the rest of the larger parks in the state, the defendant's approval standards were less restrictive. The defendant proffered several photographs taken of the exterior and interior of the unit in question which photographs corroborate Blakely's observations and conclusions (Defendant's Exhibits 4, 7, 10, 11, 12, and 14).
On February 27 and 28, 1991, the plaintiff had Berlin Mobile Home Service Center, Inc., perform additional repairs to the unit, including repairing the furnace and reconnecting the plumbing system.
On March 5, 1991, the plaintiff submitted an application to the East Windsor Building Department requesting that a certificate of habitability issue for the mobile home (Plaintiff's Exhibit E). Pursuant to this request on two occasions between March 6 and 11, 1991, a building inspector from that department inspected the unit (Plaintiff's Exhibits G and I). This inspector utilized a mobile home inspection checklist to guide his examination, and the found that the mobile home satisfied the minimum requirement for each category on the checklist (Plaintiff's Exhibits F and G). CT Page 4361 These categories comprised, among other items, the electrical, plumbing, and heating systems; the stairs and railings; the condition of the roof, walls, ceilings, floors, windows, doors, and supporting structures. As a result of these inspections, a certificate of habitability for the unit issued on March 15, 1991 (Plaintiff's Exhibits H, I, and J).
On March 11, 1991, Berlin Mobile Home Service Center, Inc., made additional repairs to the unit regarding the installation of smoke detectors, a furnace shutoff switch, and furnace repairs (Plaintiff's Exhibit M).
On March 6, 1991, the defendant notified the plaintiff of thirteen defects which had been disclosed by Blakely's inspection and which had to be remedied before resale approval would be granted by the defendant. Apparently in response to this letter, the plaintiff asked the defendant to forward a copy of the defendant's resale standards to it. On March 21, 1991, the defendant complied with this request (Defendant's Exhibit 15). These standards are Appendices B and C of the defendant's rental agreement (Defendant's Exhibits 8 and 13).
The following day, March 22, 1991, the plaintiff mailed a letter to Robert Hurley, Director of Professional Licensing with the Department of Consumer Protection (DCP) (Plaintiff's Exhibit N). The plaintiff requested that the DCP informally mediate the dispute which had now arisen between the plaintiff and the defendant as to what was required to obtain resale approval. Neither party requested that the DCP issue a declaratory ruling concerning the dispute, and the DCP had no official file or records pertaining to the matter. However, a special investigator for the DCP, Joseph Gudeahn, did informally view the unit in March 1991 by walking through it and noting its general condition. The observed weak spots in the floors; evidence of water damage to the ceiling; the need for roof resurfacing; and rated the condition of the unit as fair to poor.
Based on the absence of resale and entry approval the purchase of the mobile home by DeSousa fell through, and the plaintiff initiated this suit.
I CT Page 4362
The defendant has alleged that this court lacks subject matter jurisdiction to decide this case because the plaintiff did not exhaust its administrative remedies in that the plaintiff failed to request that the DCP render a declaratory ruling concerning the dispute as authorized by Connecticut General Statutes Section 21-79(e). The defendant cites the case of Connecticut Mobile Home Assn., Inc., v. Jensen's, Inc., 178 Conn. 586 (1979) in support of its position.
In that case our Supreme Court affirmed a trial court's sustaining of a demurrer to a complaint which sought a declaratory judgment and an injunction against a mobile home park owner who allegedly was including provisions in its rental agreements which were forbidden by Connecticut General Statutes Section 21-82. At the time that case arose, the real estate commission was empowered to issue a declaratory ruling as to the validity of the lease provisions, Ibid. p. 589. The Court held that bypassing this administrative route contravened Connecticut General Statutes Section 4-175 which authorized a trial court to render declaratory judgments, Ibid. Thus, our Supreme Court concluded that the trial court correctly held it lacked jurisdiction to render a declaratory judgment in the case, Ibid., p. 591.
The instant case is somewhat similar in that Connecticut General Statutes Section 21-79(e) expressly authorizes the DCP to issue a declaratory ruling regarding whether a mobile home park owner's refusal to approve resale violates statutory restrictions on such refusal. However, in the present case the plaintiff does not seek a declaratory judgment, but rather claims monetary damages and injunctive relief.
In Connecticut Mobile Home Assn, Inc., supra, the plaintiff requested both a declaratory judgment and an injunction. The Supreme Court expressly stated that, as to the injunction portion of the complaint, its decision was "not base[d] on the exhaustion doctrine," Ibid., p. 592. Rather, the Court affirmed the trial court on the basis that the complaint omitted "essential allegations, which, if true, could support the award of injunctive relief and permit a bypass of the administrative procedure," Ibid., p. 593 (emphasis added). Because the plaintiff in the case sub judice seeks monetary and injunctive relief, and not a declaratory judgment, the exhaustion doctrine is CT Page 4363 inapplicable, and this court has subject matter jurisdiction to decide the merits of the parties claims despite the lack of a declaratory ruling request by the parties under Connecticut General Statutes Section 21-79(e).
 II
Turning to the merits of the plaintiffs case, the court notes that all four counts of the amended complaint are based on the common essential assertion that the defendant has wrongfully withheld approval for the resale of the plaintiff's mobile home. The court also notes that, because the plaintiff acquired ownership of the unit by way of foreclosure, the plaintiff has assumed and is bound by the rental agreement and the rules and regulations of the defendant's park, Connecticut General Statutes Section21-79(a).
The plaintiff first contends that the issuance of the certificate of habitability by the East Windsor Building under Connecticut General Statutes Section 21-68a, precluded the defendant from withholding its resale approval (Plaintiff's Post-Trial Brief, p. 7). The court rejects this reading of Connecticut General Statutes Section 21-68a.
The various sections of Connecticut General Statutes Chapter 412 which governs mobile homes and mobile home parks must be scrutinized together. Section 21-70 sets forth what topics a mobile home park owner may address in its rental agreement with mobile home residents, and this section specifically includes provisions regarding an owner imposing conditions regarding resale, Connecticut General Statutes Section 21-70(a)(6). Section 21-79(a) provides that no park owner can require removal of a mobile home which is safe, sanitary, and in conformance with aesthetic standards, Eamiello v. Liberty Mobile Home Sales, Inc., 208 Conn. 620
(1988), p. 630. Section 21-79(b) creates a presumption that a mobile home is safe and sanitary, if constructed according to any nationally recognized building code, and that failure to meet such a code is not grounds to withhold resale approval unless such failure renders the unit unsafe or unsanitary, Ibid. Section 21-79(c) places the burden of showing a mobile home is unsafe, unsanitary, or substandard aesthetically on the park owner, Ibid. Section 21-79(e) provides a procedural mechanism to resolve disputes between CT Page 4364 parties concerning whether a unit is unsafe, unsanitary, or fails to meet aesthetic standards.
If the legislature intended Section 21-68a to confer automatic resale approval once a local building official issues a certificate of approval, it could have easily stated so explicitly. Section 21-68a merely provides that, if either an owner or residence so requests, the local building official is obligated to inspect the unit and issue the certificate if appropriate. It is significant that Section21-68a does not address the question of meeting aesthetic standards at all. It would be a strange procedure which allows a park owner to withhold resale approval on aesthetics grounds in all cases except where a local building official says the unit is safe and sanitary and does not address aesthetics.
Also, the plaintiff's interpretation of Section 21-68a
renders Sections 21-79(a), (b), (c), and (e) superfluous once a local building official issues the certificate of approval. If this was to be the case, one would expect Section 21-79 to contain language exempting its application under those circumstances. No such exemption is present in Section 21-79, or in Chapter 412 for that matter.
Finally, an examination of the Eamiello case, supra, discloses, at pp. 628 and 629, that in that case the local building official had issued multiple certificates approving the mobile home for habitability. Yet, our Supreme Court still discussed and decided that case with reference to the park owner's burden to establish that the mobile home in question was unsafe, unsanitary, or in violation of aesthetic standards, Ibid, pp. 630 through 632. If the plaintiff's position is correct, the Supreme Court could have dealt with this issue with dispatch and no scrutinization of whether the park owner had satisfied its burden would have been necessary to the decision.
Therefore, the court holds that Section 21-68a obligates local building officials to share their resources to aid owners and residents to resolve disputes over resale approval but does not obligate the disputants to accept its determination.
B CT Page 4365
Having determined that the issuance of the certificate of habitability by the East Windsor Building Department does not end the matter, the court now addressed the question of whether the defendant wrongfully withheld approval for resale under Section 21-79. As noted above, Section 21-79(c) places the burden to show that the plaintiff's mobile home is unsafe, unsanitary, or aesthetically substandard on the defendant. After consideration of the testimony, exhibits, and arguments the court finds that the defendant has sustained this burden.
The court finds that the testimony of Blakely concerning the condition of the mobile home to be credible, corroborated by other evidence, and superior to other evidence in the case. Without repeating the results of his inspection recited in detail above, the list of thirteen defects, a copy of which is attached to this memorandum, most of which remain uncorrected, clearly establish that this unit is unsafe, unsanitary, and below the defendant's aesthetic standards. The plaintiff did correct the lack of smoke detectors and problems regarding the furnace and plumbing, but the remaining flaws remain uncorrected. The lack of "tie-downs" to prevent high winds from toppling the unit, endangering its occupants and neighbors, appears to be fundamental to the safety of a mobile home. The rotted flooring and leaking roof create accident and electrical hazards as well as providing favorable conditions for pest infestation. The blocking of a window by the positioning of a large appliance in front of it prevents access to the window creating safety and sanitation problems, as well as being visually unattractive to passerbys. The unsecured, metal steps violate safety and aesthetic regulations of the park.
The defendant's reliance on Blakely's observations and characterizations of the unit rather than those of the Building Inspector appear bona fide and well placed. The court is convinced by a preponderance of the evidence that the defendant has rebutted any presumption that the mobile home is safe, sanitary, and aesthically within standards created by statute or by the issuance of the certificate of habitability.
For the above reasons, the court renders a judgment for the defendant on all counts of the complaint. CT Page 4366
BY THE COURT,
Samuel J. Sferrazza Judge, Superior Court
[EDITORS' NOTE: THE HUD GUIDELINES IS ELECTRONICALLY NON-TRANSFERRABLE.]